ELLIS, Judge.
This suit was originally filed by the father of the plaintiff who subsequently became emancipated by marriage and is now suing the Department of Highways of the State of Louisiana, his employer as of April 1, 1948, the date of the alleged accident, and its insurer, the Travelers Insurance Company, for $30.00 per week for 400 weeks.
Plaintiff alleged and defendant admitted that the plaintiff suffered physical injury by accident when he was struck on or about the head by a falling object while employed by the Department of Highways. Defendants denied that the injury sustained by plaintiff rendered him unable to do work of the same character as he was performing when injured except for the period beginning April 1, 1948 and ending April 11, 1948, and denied that plaintiff was suffering any disability other than as stated as a result of the injury sustained by him. Defendants further deny that plaintiff is entitled to a weekly payment of $30.00 and, on the contrary, allege that plaintiff was employed at a salary of $120.00 per month or an average weekly wage of $27.65, and, therefore, 65% of such amount would fix the weekly compensation at $18.00 if plaintiff is entitled to judgment.
There was judgment in the Lower Court awarding to plaintiff compensation in the sum of $20.00 per week for a period not to exceed 400 weeks with the usual interest, and subject to certain credits about which there is no dispute, and all costs.
From this judgment the defendants have appealed and the plaintiff has answered the appeal asking that the weekly rate be increased to $30.00.
It is plaintiff’s contention that as a result of having been struck on the right side of the head by an object called a swivel, weighing approximately seven to eight pounds and which fell a distance of approximately twelve feet and rendered him unconscious for approximately 45 minutes, he has suffered such severe headaches as to be unable to return to the character of work he was performing when injured.
It is necessary to decide, first, whether the plaintiff had disabling headaches after the accident and, second, whether there was any connection between the accidental injury and the headaches.
The evidence shows that plaintiff was employed by the Department of Highways as a junior soil tester and the rig was being operated near Union Station in the City of New Orleans at the time a part of it fell and struck plaintiff on the head. He was rushed to the emergency room of Touro Infirmary and was unconscious for approximately 45 minutes. After receiving first aid at that institution he was removed to the Baptist Hospital where he remained until April 3, 1948 when he returned to the home of his parents in Jackson, Louisiana. He returned to work on April 12, 1948 and continued his employment with the Department of Highways until August 2, 1948 when he voluntarily quit in order to join the Army. He entered the Army on August 10th under the Aviation Career Plan, where he remained until the latter part of March 1949 when he received a disability discharge.
It is necessary that a somewhat detailed review and analysis of the medical and lay testimony in this case be made in order to arrive at a decision.
The District Court depended almost entirely upon the testimony of the plaintiff *819 alone and cited Vega v. Higgins Industries, Inc., et al., La.App., 23 So.2d 661.
Plaintiff’s skull was not fractured as a result of the accident and x-rays made of his head showed no abnormality, and the opinions of the doctors are based purely upon subjective symptoms and the history of the case as obtained from the plaintiff. Upon his return to work on April 12, 1948 plaintiff performed his work as satisfactorily as he had done prior to the accident. He did complain to a fellow employee by the name of LeBlanc that his head still bothered him. His foreman testified that prior to the time he returned to work he has a personal conversation with plaintiff and asked him about his head and plaintiff told him that he had slight headaches from his injury, and he testified that had plaintiff told him he was still suffering from his head after returning he would have recommended that he do light work in the laboratory. The foreman further stated that his work was satisfactory and that he did not complain to him, that he could remember, after his return.
Plaintiff admitted that he did not seek the advice nor services of any doctor from April 12, 1948 until he was admitted to the Army Hospital on January 13, 1949. He contended that the heat made his head much worse, however, the fact that he worked in the hottest part of the summer without laying off or leaving his work for any noticeable length of time without complaining of severe pain to any fellow employee is sufficient proof that if he had headaches they were not excruciating or too severe. The fact that he did his work satisfactorily upon his return until he voluntarily terminated his employment with the Department of Highways without losing any time is also proof that he was able to perform the same duties after the accident as were required of him before the accident. During the period from April 12 to August 2 he returned homfe on weekends and, outside of the testimony of his father that he spent his weekends in bed, there is no other testimony that he suffered severe headaches at such times.
Plaintiff passed the physical examination for the Army and he was asked if he told the examiner, about his headaches and he answered, “they asked about the headaches and I told them I had headaches occasionally.” • His statement to the Army examiner that he had occasional headaches and his testimony that his headaches were very severe and became more severe after the accident is inconsistent. His statement that he had occasional headaches is more consistent with his -work record and his medical history during the period after the accident until he voluntarily left the employ of the Department of Highways than his testimony of severe headaches.
After passing the'Army examination he was sent to San Antonio, Texas where he stayed three weeks, and then to * Sheppard Field in Texas where he took his basic training and remained twelve weeks. He returned home on leave in November and was then sent to Chanute Air Force Base at Chanute, Illinois and arrived there about December 1st, 1948. He testified that during this time in the army his nose bled and his head hurt him but that he never went to a doctor or reported to the Army Hospital. Obviously, from the record he completed his basic training satisfactorily and evidently his headaches did not interfere with the performance of his army duties.
Plaintiff returned home on leave for Christmas and there is no testimony in the record that at this time he suffered. any severe or extreme headaches, and he never sought any medical advice or treatment. In fact, the only testimony as to any treatment during his return home on leave was in November when he bought eye wash as he stated his eyes were troubling him from Oklahoma sand.
. He returned to his base around the first of January, and on the 13th of January was admitted to the hospital. This is the first time that plaintiff was seen by a doctor or treated by a doctor since being discharged from the Baptist Hospital in New Orleans on April 3, 1948. It is difficult for us to believe that if his headaches were as severe as he testified during this entire time that he would not have sought medical assistance. He was admitted to the army hospital upon complaint of severe and frequent headaches on the right side of his *820 head, which was the side upon which he received the blow.
Chief of the Neuropsychiatric Service at the Chanute Air Force Base Hospital was a young doctor from New Orleans, Louisiana, who had graduated from Tulane University in 1946, who diagnosed plaintiff’s trouble as post concussion syndrome, and who was instrumental in giving plaintiff a certificate of disability discharge “because of frequent, recurrent and severe headaches preventing his performing duty.”
After his discharge from the Army, plaintiff returned to his home in Jackson, Louisiana and was employed to operate a small country store which he was still doing at the time of the trial. His work record in the store, insofar as having to 'be away from his work on account of headaches, was good. His employer testified that on several occasions his mother called and told him that plaintiff would not be able to come to work, and he remembered one particular occasion because he himself was also sick, and as plaintiff did not come to work he had to work in this condition. He testified that he did notice that plaintiff kept aspirin handy in the store, however, there is nothing in his employer’s testimony to show that he was impressed with plaintiff’s illness or that plaintiff was ill to any extent. He also testified that plaintiff’s work was satisfactory and that his .duties consisted of the operation of a country store in which he sold dry goods and groceries and also feed. Plaintiff’s father and mother testified that his headaches were very severe and that sometimes at night he would be crying with his head and they would get up and doctor him. From the testimony, we do not believe that plaintiff has proven that he had disabling headaches, that is, to such an extent that he was unable to perform the duties of a junior soil tester, which was his classification on the date of his injury while employed by the Department of Highways.
Even though we are of the opinion that plaintiff has failed to prove by a preponderance of the testimony that he has headaches to such an extent to disable him from performing the duties of a junior soil tester, we have decided to also consider whether plaintiff’s disability, admitting for the purpose of decision that he did have disabling headaches, is the result of or has a causal connection with the injury suffered by him on April 1, 1948.
The first that was known of plaintiff’s history was that given to Dr. Weisler in the Army Base Hospital at Chanute, Illinois, in January, and which is contained in this doctor’s answers to direct and cross interrogatories taken in New Orleans on July 6, 1949 and succinctly stated in a letter dated March 21, 1949, and which was written at the request of the plaintiff for the purposes of this law suit and which is quoted in full as follows:
“Station Hospital
3345th Technical Training Wing
Chanute Air Force Base, Illinois
21 March 1949”
“To Whom it May Concern:
“Luden R. Dours was admitted to the hospital 13 January 1949 because of frequent, recurrent, and severe right parietal or hemispheric headaches. The history revealed that these severe recurrent headaches followed a blow to the right parietal area and occurred while a civilian working on a construction project in New Orleans, Louisiana approximately April 1948, and resulted in a small fracture of the area being complained of. He was instructed to remain at rest for several weeks, but disregarded these instructions and has suffered persistently from his headaches. The history further reveals headaches of a somewhat similar nature, but not incapacitating in degree, occurring since early childhood, arid similar to those suffered by his mother. For a short time they became quite severe following being knocked unconscious during a football game at about 15 years of age, but their regularity and severity did not persist as have the present ones.”
“Physical examination revealed a tendency to hypertension and intravenous pyelograms revealed dilatation of the right ureter at the upper limit of normal. However, these findings were not felt to be *821 significant in this case. A tendency towards ptosis of the lids, particularly of the right, was noted, hut the patient claimed that these had been present throughout pictures of his youth. While in the hospital he ■continued to complain, but had progressively diminishing symptoms. Because of the persistence of the incapacitating symptoms, however, he was tried empirically and without too good justification from the nitroglycerin test on intravenous histamine, which did not produce any marked change in his symptoms.”
“It being felt that the condition was essentially one of a post concussion syndrome which might take several months to several years to alleviate, the recourse of a CDD was felt to be the fairest one to the government and to the patient.”
“Morris J. Weisler (Sgd)
Captain, M. C.”
By way of explanation of the meaning of "CDD”, this doctor addressed a letter to ■one of the attorneys for plaintiff on April 11, 1949 which reads as follows:
“In reply to your letter of April 5, 1949, the term CDD refers to a Certificate of Disability Discharge. This is a discharge for medical reasons when it has been determined that the condition interferes with the performance of duty and cannot be expected to improve under hospitalization-to the point where he can be returned to ■duty within a reasonable length of time. Such a discharge may or may not carry with it compensation for disability, depending on whether the condition was incurred while in the service and in line of duty or not.”
“In this particular case the disability was caused by injuries suffered prior to enlistment in the Army and is not considered to he in line of duty and, therefore, not subject to receive compensation from the government.”
Dr. Weisler was of the opinion that plaintiff was suffering from post-concussion syndrome and that this condition was attributable to the accident. This doctor was propounded a cross interrogatory as follows : “Could not a diagnosis of constitutional headache have been made as a result of Mr. Dours’ complaints?”
His answer was: “The diagnosis of constitutional headache is one with which I am not familiar and do not use. If the implication here is of headaches on a psycho-neurotic basis, I don’t deny that this was seriously entertained. However, the complete psychiatric history did not, in my opinion, fit in as well with such a diagnosis, as with the one I discharged Mr. Dours from the Army with.”
All of the doctors in this case based their diagnosis on the plaintiff’s history, what the plaintiff told them and any objective symptoms or the lack of same as the result of an examination. The plaintiff introduced in evidence a report made to one of the attorneys for the plaintiff 'by Dr. Joseph Sabatier, Jr. of Baton Rouge, Louisiana, whose specialty is general surgery, and who also testified in the case. His diagnosis, based upon the history given him by plaintiff and an examination which was negative except for two things which have no connection with the injury, was post-concussive syndrome manifested by recurrent right-sided headaches. He also examined x-ray pictures made shortly after plaintiff’s injury and could detect no significant abnormality.
Plaintiff did not give Dr. Sabatier a history of any headaches prior to the injury or of having been kicked in the head at the age of 15 and rendered unconscious with such force as to cause a blackout from which plaintiff said he suffered severe headaches for a short time, nor did he tell this doctor that he had suffered from headaches of a somewhat similar nature 'but not incapacitating in degree since early childhood and similar to those suffered by his mother. Upon being given this additional history or facts, this doctor stated that it would suggest that plaintiff had been suffering from constitutional headaches since early childhood. He was then asked by the ■Court if such additional history would in any way affect his diagnosis and he frankly answered that it “would cloud the issue a bit if the headaches that he now complains of are of a similar character to the headaches that he had prior to the trauma to his *822 head referred to by Mr. Hardin, one would be prone to believe then that his present complaint of headaches is simply a manifestation of a persistence of a preexisting condition, conceivably intensified by the trauma.” He further stated, however, that “he could have headaches before hand and he could have these headaches entirely different,” that is, from the trauma. He was then asked if it was possible that plaintiff could have had headaches prior to the trauma which did not disable him but which subsequent to the trauma became disabling from the aggrevation and if that were possible or probable, and his answer was, “It is probable.”
It is admitted by all the doctors that there were no objective symptoms to indicate that plaintiff was suffering from a post-concussive syndrome and that their diagnoses were based entirely upon the history and subjective symptoms.
Dr. McVea and Dr. Slaughter were called by plaintiff for the purpose of refuting the testimony of Dr. Howard Karr to the effect that a “post-concussive syndrome” or “post-concussion syndrome” or “post-traumatic state” could not exist without there being some definite objective neurological finding. These two doctors had never examined the plaintiff, however, they were asked many hypothetical questions. Dr. Slaughter stated that with the history of the plaintiff as given by Mr. Phillips, counsel for defendant, which history was fairly stated, it would be impossible for him to determine definitely whether or not plaintiff’s headaches were due to constitutional causes or traumatic causes. The testimony shows that plaintiff was suffering from hypertension or high blood pressure, the exact degree not being given, but that it could cause headaches, and he was also suffering from a kidney ailment and eye strain, both of which could cause the headaches.
Dr. McVea was asked a question on redirect examination by counsel for the plaintiff which is one and three-quarter pages in length and which gives a full history of plaintiff’s case, and which is most favorable to the plaintiff in that the question contains the proviso, after giving all of the facts, that the doctor was convinced that the patient was telling the truth, based upon that, did the doctor believe that a diagnosis of post-concussive syndrome “can be made and that it can be attributed to the blow on the head that he had on the 1st of April, 1948.” In response to this question, Dr. McVea stated that “From what you have told me I would not be prepared to make such a diagnosis. Such a diagnosis could, be made and such a condition could be responsible for the boy’s headaches.” He did go on to state, however, that he was sure he could diagnosis the case if he observed him for a period of nine weeks, and that in the absence of objective signs and with negative findings on examination that a diagnosis would depend upon the patient’s history and the evaluation of the patient by the diagnostician.
It is our opinion that Dr. Slaughter’s and Dr. McVea’s testimony on the whole is favorable to the defendant rather than the plaintiff.
Dr. Howard Karr, a neurologist and neurosurgeon, was of the definite opinion that the plaintiff’s disability of headaches could not be attributed in any way to the accident-
Dr. Dan Baker, practicing physician and surgeon of New Orleans, who treated the plaintiff when he was injured and removed to Baptist Hospital, was of the positive opinion that the injury in no way contributed to plaintiff’s headaches. He was of the opinion that they were constitutional or inherited, and he cited an example in his own family of such headaches. Dr. Baker said the injury was a minor one and that it was most probable that there was m> connection between the blow and the headaches, as he did not believe them to be the-result of such a minor injury.
There was some attempt to deny that the plaintiff’s mother suffered from headaches,, however, we believe that she did and that the record so reveals. The plaintiff certainly made such a statement to the army doctor else he would never have known it, and the father in his testimony attempted to attribute the mother’s headaches to sinus trouble, whereas the mother, when she took the stand, said it was not caused by-sinus trouble but by female trouble.
*823 The statement made by Judge Ta-liaferro of the Second Circuit in the case of Spears v. Brown Paper Mill Co., La. App., 9 So.2d 332, 337, is appropriate to the facts, issues and proof in this case:
“We fully appreciate the difficulty, in a case of this character, of proving the cause of disability. But when the testimony fails to establish with reasonable certainty the cause of disability to be that alleged upon, but does disclose that the disability could be the result of another disease, a decision of the issue thus tendered must rest upon the fundamental rule of evidence, that plaintiff is required, before being entitled to a recovery, to prove the verity of his contentions by a fair preponderance of the evidence.”
■ “Plaintiff in a compensation case, in keeping with the general rule, and as has been repeatedly held by the courts of this state, carries • the burden of proof. Conjecture and probability may not serve as the basis of judgment in such a case, notwithstanding the well established and justified policy on the part of the courts in liberally construing the law in favor of the injured workman or his dependents.”
Also most appropriate is the statement in McCray v. Yarbrough, La.App., 20 So.2d 447, 449, as follows:
“On the whole, an analysis of the record definitely convinces us that plaintiff has failed to prove his claims of disability. As has been stated many times before, the plaintiff in a compensation case is required to prove his claims by a preponderance of the evidence, and not by conclusions based upon speculation or possibility.”
“It is quite .true that symptoms of pain of necessity are subjective in nature, and the existence, vel non, of pain is a fact known with absolute certainty only by the individual who claims to experience pain. However, as a practical proposition, complete faith cannot be accorded to claims of an injured party as to the existence of the pain simply upon the basis of his own testimony, and, for that reason, it is required that such evidence be strengthened by corroborative circumstances and testimony which would lead to an acceptance of such claims.”
The District Court cited and relied upon Vega v. Higgins Industries, Inc., supra. In that case the question as to whether the piesent condition of the injured workman was caused by his injury was decided upon the testimony of the medical experts and 'the Court stated:
“On the whole we believe the medical testimony clearly preponderates in favor of the plaintiff’s contention that his present physical condition is due to his accident and, therefore, we are of the opinion that he should recover.” [23 So.2d 663.]
The medical testimony in the case at bar does not preponderate in favor of the plaintiff. Plaintiff has failed to bear the necessary burden of proving that he suffered such severe and frequent headaches as disabled him from performing the duties ' of a junior soil tester, and, further, has failed to prove, even if we admit that he did have such headaches, that they were attributable or connected with his injury.
• It is therefore ordered that the judgment of the District Court be reversed and plaintiff’s' suit dismissed at his cost.