CULPEPPER, Judge.
In this workmen’s compensation case plaintiff contends he is totally and permanently disabled as a result of a heat stroke with residual intolerance to heat. The lower court rendered judgment for the plaintiff. The defendant insurer appealed.
The fundamental issue is whether plaintiff suffered a true heat stroke, a very rare and very serious condition involving damage to the heat regulating mechanism of the brain and frequently resulting in a permanent intolerance to heat, or did plaintiff simply suffer the very common condition known as heat exhaustion, which has no after effects.
■ The facts show that on a hot summer day, July 9, 1960, plaintiff was working as a roughneck on an oil rig. Plaintiff is 59 *464 years old, an advanced age for this very strenuous type of work. He had gone to work at 7:00 a. m. and was “hauling boards”, in the hot sun. He stated that by 11 o’clock he “couldn’t go no more” so he walked to the boiler and sat down in the shade. One of his co-employees washed him off with ice water and brought him some ice to hold on his head. Later plaintiff moved under the floor of the rig where he stayed in the shade until quitting time at 3 :00 p. m., at which time he was driven home. He stayed at home that night and went to see Dr. Frank Savoy, Sr. the next morning. Dr. Savoy examined plaintiff, i. e., he felt his pulse, took his blood pressure and stethoscoped his chest. This doctor prescribed no treatment except a liquid medicine of some unknown type. Dr. Savoy, Sr. died before the trial of this case and we therefore do not know his exact diagnosis. We do know, from plaintiff’s own testimony,, that Dr. Savoy, Sr. did not tell plaintiff he couldn’t go back to work.
After four or five days plaintiff went back to work but, according to his testimony, could not “take the heat” and had to quit. Plaintiff also testified that in August of 1960 he tried to pick cotton but was unable to do so because he couldn’t stand the heat.
Subsequently, plaintiff employed an attorney who sent him to see Dr. Frank Savoy, Jr., a general practitioner, in December of 1960. Plaintiff was later seen by Dr. Thomas IT. DeLaureal and Dr. Donald F. Gremillion, both specialists in internal medicine, in which specialized field the condition known as “heat stroke” falls.
Since the findings, opinions and diagnoses of these three doctors are essentially the same, we see no need to discuss them separately. These doctors explained at the outset that there is a great difference between heat stroke and ordinary heat exhaustion. Heat exhaustion is caused by excessive perspiration resulting in dehydration and a deficit of chloride which can cause weakness, leg and arm cramps and headache. After treatment, consisting of the replacement of fluids and chlorides and cooling the patient down, there are no residual effects. Heat stroke occurs where a person is exposed to a tremendous amount of heat and the brain becomes so overly heated that the heat controlling mechanism of the brain ceases to operate. The victim stops sweating and immediately begins to run a very high temperature, sometimes as high as 106 to 108; his blood pressure plunges down; he usually goes into a coma and may suffer vasomotor collapse. The treatment is of an emergency nature, the purpose of which is to cool the body down as quickly as possible. The patient should be hospitalized and his entire body packed in ice. The symptoms are very severe and very obvious. True heat stroke is frequently fatal. If the victim does survive he must remain in the hospital several days and may be left hypersensitive to heat because of damage to the brain.
True heat stroke is so extremely rare that not one of the three doctors who testified here had ever treated such a condition. Dr. Gremillion had seen one case while interning in Charity Hospital in New Orleans, in which instance the emergency treatment consisted of placing the patient in a tub of ice and turning fans on him. Consequently, the expert medical witnesses in this case gained all of their knowledge about heat stroke from reading various text books on the subject, rather than from personal experience.
It is apparent from their testimony that each of the three doctors took the history of the illness and conducted a physical examination of plaintiff with the idea of determining whether he had suffered a true heat stroke on July 9, 1960 with residual disability therefrom. It is noteworthy that in giving these doctors his history, plaintiff did not tell them he had stopped sweating. Dr. DeLaureal testified that he asked plaintiff specifically whether he had stopped sweating and plaintiff stated he had not. On the basis of the history and their respective examinations, all three of the doctors *465 were of the opinion that plaintiff had not suffered heat stroke and that he was not disabled. They based their opinions in part on the history given by plaintiff that he had not stopped sweating, but also on the history that he did not immediately after the incident, show any of the severe symptoms of high temperature, low blood pressure and coma which are usually associated with a true heat stroke.
In an effort to overcome his lack of any expert medical testimony that he was disabled as a result of a heat stroke on July 9, 1960, plaintiff endeavored to show that actually he had stopped sweating before he quit working. Despite his statement to Dr. DeLaureal to the contrary, plaintiff testified at the trial that he recalled having stopped sweating about one-half hour before he quit work. Plaintiff also introduced the testimony of Joe Francois who stated that when he saw plaintiff, about 20 minutes after plaintiff had stopped working, he was not sweating. However, this witness’s testimony is of little value because by that time plaintiff had admittedly been washed off with ice water and had been holding ice to his head, and sitting in the shade. It was apparently on the basis of this testimony that the trial judge concluded plaintiff had stopped sweating and suffered a true heat stroke with a residual intolerance to heat.
We cannot agree with the trial court’s conclusion. Even if we were to assume for the sake of argument that the plaintiff did stop sweating before he quit working, an assumption of fact which appears highly unlikely to us under the evidence, none of the other very serious symptoms of true heat stroke were present. All of the expert medical witnesses testified that in the case of a true heat stroke the victim is critically ill, with very high temperature and very low blood pressure and that he is in a coma and requires immediate hospitalization and dramatic treatment. The expert medical witnesses obviously were of the opinion that if plaintiff had suffered a true heat stroke he would not have been able to walk from the rig over to the shade; lay there until 3 o’clock; then walk to an automobile; then walk to his home on arriving there; then go to the doctor the next day. Both Dr. Frank Savoy, Jr. and Dr. Gremillion testified specifically that if plaintiff had suffered a true heat stroke on July 9, it is highly unlikely that Dr. Frank Savoy, Sr. on July 10, would not have found sufficiently serious symptoms to place the plaintiff in the hospital and certainly would have advised plaintiff not to work.
The issue here is whether the claimant has sustained his burden of proving any causal connection between the accident and his alleged disability. See Malone’s Louisiana Workmen’s Compensation Law and Practice, Secs. 251-252 for a general discussion of the legal problem. The test, as established by this court, is set forth in the recent case of Johnson v. Cloud, 125 So.2d 478 (La.App., 3 Cir., 1961; writ of certiorari denied) as follows:
“The jurisprudence of this State has been established to the effect that in a compensation case, as in other cases, plaintiff bears the burden of proof, and he is required to establish his claim with reasonable certainty by a preponderance of the evidence. Burk v. Gulf Refining Co. of Louisiana, La.App. 1936, 171 So. 135; Dours v. Travelers Ins. Co., La.App.1950, 48 So.2d 817; Caldwell v. Caldwell, La.App. 1950, 55 So.2d 258; Roberts v. M. S. Carroll Co., La.App.1953, 68 So.2d 689, 693.”
It is our conclusion that plaintiff has failed to prove by a preponderance of the evidence that he is disabled as a result of the incident of July 9, 1960. The condition of which he now complains, i. e.,. an intolerance to heat, cannot be demonstrated by any objective tests. It is an entirely subjective symptom. All three of the expert medical witnesses expressed the opinion that plaintiff had not suffered a heat stroke. All three were of the opinion plaintiff had suffered no residual disability. Plaintiff’s *466 evidence regarding cessation of sweating before he stopped working is highly unsatisfactory, but even if accepted would not, in the face of the lack of the other serious symptoms of a true heat stroke, be sufficient to show by a preponderance of the evidence that the plaintiff actually suffered this very rare and very serious condition. Plaintiff has introduced no expert medical testimony expressing an opinion that he did suffer a heat stroke. We do not think plaintiff has proved his case.
Applicable here is the following statement found in Malone’s Louisiana Workmen’s Compensation Law and Practice, Section 252, page 299:
“The highly technical nature of the issue of causal relation between accident event and disability impels resort to expert opinion as much as possible. Expert medical testimony consistent with the lay circumstances is the strongest proof of causal relation. Further, a strong, consistent opinion by a majority of the testifying physicians will usually prevail over adverse lay circumstances.”
In the instant case we are dealing with a very rare disease. Its cause and symptoms are highly technical issues. We must rely heavily on the expert medical opinions. Here, all of the doctors were of the strong and insistent opinion that plaintiff had not suffered a heat stroke.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of the fendant, The Travelers Insurance Company, rejecting plaintiff’s demands. All costs in the lower court, as well as the costs of this appeal, are assessed against the plaintiff appellee.
Reversed and rendered.
On Application for Rehearing.
En Banc. Rehearing denied.