### LAKIOS et al. v. NEW ORLEANS, T. & M. RY. CO.
### No. 1113.

Court of Appeal of Louisiana. First Circuit.

April 17, 1933.

Robert R. Stone, of Lake Charles, for appellants.

Frank E. Powell, of De Ridder, for appellee.

LE BLANC, Judge.

Mrs. Irene Lakios was delivered of a stillborn male child on the morning of June 16, 1930. On the morning previous, she had been a passenger on one of the defendant company's trains; she and her husband, George Lakios, having entrained in the city of Houston, Tex., to go to their home in in De Quincy. They were carried beyond their destination and were continuing east to Kinder, where they would again take a train that would carry them back to De Quincy. Alleging in her petition that as the train reached Kinder she sustained personal injuries as a result of the negligent handling thereof by those in charge of it, which injuries brought on her misfortune, she prays for judgment in the sum of $10,000 as damages against the defendant. Her damages are for pain and suffering from the time she was injured until the miscarriage of her child, for mental anxiety and distress to herself and unborn child, and for physical suffering since that time, as well as mental distress over her condition because of permanent injury and loss of ability to bear children in the future. Her husband also joins her in her petition and asks for judgment in a similar amount in his behalf; the damages he claims being for the loss of companionship and assistance of his wife in her household duties, mental anxiety and distress, and the loss of his wife's opportunity to bear children due to her physical condition.

The defendant is charged with negligence on the part of its agents and employees in charge of the train, in two particulars. The first is that as they were standing in the aisle of the coach in which they had been riding, preparatory to their alighting, there was a terrible jerk or sudden stop of the train which threw Mrs. Lakios against one of the car seats and then back into the aisle with great force, bruising her side and shaking her up severely. The second is that as Mrs. Lakios was about to alight from the step of the coach, after having been invited to do so by the brakeman, onto the movable footstool used in discharging passengers, the train was suddenly, and without warning, violently shunted or pushed backward, and she was thrown from the step to the ground across the stool; the latter striking her chest and abdomen, bruising her and jarring her whole body, all of which caused severe pains internally.

The defendant, for answer, admits that the plaintiffs were passengers on the train in question on the night alleged, averring, however, that they were riding free of charge, and otherwise denies virtually all of the remaining allegations of their petition.

There was judgment in the lower court in favor of the defendant, rejecting the demands of both plaintiffs, and they have both appealed.

The case presents a sharp conflict in the testimony of the witnesses on both sides as

to what actually are the true facts. The burden, of course, rested on the plaintiffs to show that the miscarriage suffered by Mrs. Lakios and the attending results complained of were caused through the negligence of the employees of the defendant railroad company in operating the train on which she was riding. The question as to whether she was a gratuitous passenger or not, and of the duty of the railroad company toward her if she was, is not stressed by the defendant as a ground upon which it seeks to be relieved of liability. The testimony on that point, however, is seriously to be considered in weighing the evidence as a whole and in determining the precise issues of fact involved in the case.

George Lakios was formerly employed as a mechanic by the defendant and was so employed on June 14, 1930. On that day, he and his wife were in Houston and left from there to go to De Quincy on defendant's train No. 10 which travels between Houston and New Orleans. They left Houston, riding on an employee's trip pass, at about 9:30 in the evening, and were due to reach De Quincy about 1 o'clock of the following morning. They were both sleeping as the train reached De Quincy, and although the station was called by both the conductor and the flagman, they were not awakened and therefore did not get off. When it was realized that they were still on the train, apparently it had proceeded too far to back into De Quincy. At any rate, that was not done, and it is from this point that the first serious dispute arises in the testimony.

Plaintiff George Lakios gives a detailed account of a heated verbal spar between himself and Conductor J. S. Hill, who was in charge of the train, which almost resulted in a physical encounter. The argument started when, as he says, the conductor insisted that he would have to pay a cash fare for himself and wife to Kinder, at which point they could catch a train that would take them back west to De Quincy. According to his testimony the conductor threatened to put them off the train if they did not pay the fare. His wife, who did not seem to understand the situation, became alarmed, paid the fare out of a $5 bill which she took from her purse, whereupon he demanded a form of receipt on which he could have the money refunded. The conductor refused to give him any such receipt, went off, and finally came back and gave him a "regulation company's receipt." He is not certain as to the amount his wife paid for the fare, but thinks it was about $2.88. Mrs. Lakios testifies that it was that amount. She, however, does not give as minute an account of all that transpired as does her husband regarding the demand for payment of the fare. C. C. Webster, witness for plaintiffs, who says that he was riding on the same coach with them, does however corroborate, in detail, George Lakios' story on this point, and if anything makes the encounter appear more violent, as he says that after Mrs. Lakios had pulled her husband down in the seat, evidently in an effort to quiet him, he "jumped up and took his coat off." According to further testimony it all resulted as Lakios had testified in his wife paying the fare with money from her pocketbook and a demand by Lakios for a special form of receipt which the conductor finally gave him. F. A. Tollison, another witness for plaintiffs, also said to be a passenger in the same coach, corroborates, in a general way, Lakios' testimony on this point, although not nearly as minutely as does Webster.

According to Lakios and Webster, there were only five passengers in the coach in which they were, after the train left De Quincy and until it reached Kinder. These five included Mr. and Mrs. Lakios, Webster, and Tollison. The fifth, according to Lakios, was a man named Duries, who, however, did not appear as a witness at the trial. So positive are Lakios and Webster that these were the only five persons in the coach that they are willing to stake the whole of their testimony on that fact alone.

Conductor Hill says that he cannot account for his overlooking plaintiffs when they reached De Quincy, but frankly admits that it does happen once in a while that night passengers are so overlooked. He testifies that they had gone some little distance when, on passing through the coach, he noticed the hat check on Lakios' hat, which was laying upside down on the seat between him and the window. He says that he then woke Lakios up, and that the latter, on realizing that they were past De Quincy, made some remark about his losing his day, meaning his day's work no doubt, and that he readily assured him that that would not happen as he would send him back to De Quincy on train No. 9 and that the only thing he would lose would be a little sleep. He swears positively that he had no quarrel with Lakios whom he knew and who had traveled on his trains quite often. There was nothing said about paying fare to Kinder, and in fact there was no reason for his taking a cash fare from them, as they could have gotten a refund on application for it. Under the conditions which presented themselves, he says that he had the right, under a rule of his company, to give an order to the conductor of the first train going west to take them back to their destination, and this he did by issuing such order written on a hat check to the conductor on train No. 9. The book of transportation rules embodying the one under which he acted is filed in the record and so is the order issued by him, which order Conductor E. O. King of train No. 9 identified as the one that was presented to him by plaintiffs when they boarded his train on the morning of June 15, 1930.

Conductor Hill testifies that instead of there being only five passengers, the coach in

which plaintiffs were riding that night was pretty well crowded, as there was a party of young ladies who were discharged at Kinder, besides several others. His testimony on this point, as indeed on others, is assailed by counsel for plaintiffs, who finds it strange that his recollection of things that happened that night is so vivid, whereas he was unable to recall any of the things that were asked him as having happened on other nights. It seems plausible that Hill as well as all the other trainmen whose testimony is attacked in the same way would have been able to recall most of the events of that night when it appears they had been made to particularly investigate and make a report on them. But conceding that Conductor Hill was in error in his recollection about the number of passengers in the coach in which plaintiffs were that night, if there is one thing certain in the case, it is that there were more than five as testified to so positively by Lakios and Webster, as, under the proof offered, there can be but little doubt that besides the five mentioned by them, there were a Mr. and Mrs. Long and their three children, who were traveling from Beaumont, Tex., to Kinder. Mr. Long's recollection is that there were eighteen or twenty people in the coach. Mrs. Long did not make any observation in that regard and therefore had no idea as to the number. She does say, however, that the coach was pretty well loaded. Both state that they were awake all the time between De Quincy and Kinder and neither heard any hot words or argument between the conductor and any of the passengers.

To follow this issue about the payment of a cash fare from De Quincy to Kinder a bit further, we find the plaintiff George Lakios again insisting that he paid cash fares to the agent at Kinder for tickets back to De Quincy and obtained a receipt on which he intended to get a refund of his money. For these tickets, he thinks the agent charged him $2.-66. In view of the testimony of Conductor King whose train carried them back to De Quincy that he accepted the order issued by Conductor Hill for their transportation, and of the testimony of the ticket agent who was on duty at Kinder that his records show that he did not sell a single ticket for train No. 9 that night, it would be difficult indeed to accept the testimony of Lakios alone on this point.

Finally, on this question as to the payment of these fares, Lakios gives another detailed account of the manner in which he came to lose possession of the receipts he claims to have obtained for their payment. He states that shortly after the accident, he was instructed to go to the claim agent's office at Houston to make a statement. He went and carried all of his papers and receipts with him. He gave his statement and the claim agent then had his stenographer prepare it for his signature. When it was presented to him he refused to sign it. Then, he says, the claim agent became incensed and threatened to strike him over the head with a walking stick. He became scared and in the excitement he picked up his papers and left, but found afterwards that the receipts had been kept. Later on he even charges that they were stolen from him. When the claim agent referred to appeared as a witness to rebut this part of Lakios' testimony, and the court observed from his appearance that he was, as he testified, a man afflicted with a form of paralysis which made of him a physical wreck, and that he had been in that condition for the past five years, it became apparent that this story of threatened physical violence on his part upon a "strong, husky looking man, in the prime of life," as the district judge describes Lakios, must have been a mere figment of the latter's imagination. Besides the claim agent's denial, Lakios' story is also contradicted by the lady stenographer who was present and took part in all that transpired.

Enough has been said on this point, we believe, to suggest the manner in which the testimony of the plaintiffs and their witnesses on the main issue of fact should be considered and accepted.

Plaintiffs and their witnesses all relate two distinct occurrences of mishandling of the train which caused Mrs. Lakios to fall, and either of which, it would seem, might have been sufficient to cause injury which might have produced the result which followed. They say that as the train approached Kinder, Mr. and Mrs. Lakios were advised of the fact by the conductor, who told them to gather their packages and be ready to get off as he did not want to make them pay any more railroad fare. That they then stood up in the aisle, and as they did so, the train gave a sudden jerk which threw Mrs. Lakios against a seat, "shaking her up pretty badly." They were then assisted by Webster and Tollison in collecting their bundles and also escorted by them to the platform and step in order to help them off. When the train came to a full stop, Mrs. Lakios was standing on the step of the coach. One of the trainmen, they are not sure which, stood next to the footstool which is used to discharge passengers, and told her to "come on." As she proceeded to do so, the train gave another sudden jerk. Lakios says that it went forward; his wife and the others say backward. At any rate, they all say Mrs. Lakios fell to the ground and from that fall she says she sustained the severe injuries which brought on the miscarriage that occurred the following morning.

Conductor Hill, who investigated the accident a few months after it happened, testified that there was nothing unusual about the handling of the train the night of the alleged accident. They stopped at the water tank be-

fore reaching the station at Kinder, the stop being a smooth one, without any jolting. He says that he was the one who assisted in discharging the passengers standing next to the step box and inviting them to alight, and that the train did not move until all of them had been discharged. The train engineer James Finnegan and Flagman J. B. Mitchell both testified that there was no jerking of the train before the stop at Kinder station, nor was there any backing up after the train had stopped to discharge passengers. Both of these witnesses testify that the matter was impressed on their minds because they heard of the alleged accident to Mrs. Lakios two or three days after it was said to have happened and they made more than the usual effort at recalling the facts in connection therewith. Others of the train crew, some of them negroes, were in a position to see the passengers alighting from the train and did not see any one fall from the steps. Mr. and Mrs. Long whose testimony has been previously referred to, both say that there were no rough stops made and that they saw and heard no one fall.

It so happens that this witness Long is also employed by the defendant company as a section foreman, and his testimony and that of his wife is also depreciated by counsel for plaintiffs on the ground of interest. We are asked to consider all of the defendant's testimony in the same light and are reminded of the caution with which courts generally receive the testimony of railroad employees. It may be that there are cases in which testimony of railroad people has been unfavorably commented upon by some courts, but we know of none where the criticism was based on the mere fact that they were railroad employees. If their testimony were to be discredited on that ground alone, there would be good reason to regard Lakios' testimony in very much the same light, as he himself was in the employ of the defendant railroad company at the very time that his alleged cause of action arose. With regard to the testimony of Webster, we agree with the trial judge that it is a rather strange coincidence that he lives in the little town of Palacious, Tex., where the Lakios formerly resided and that he works for a man named Glaras, who is Lakios' brother-in-law. Tollison, the other witness, is a friend of Webster's, and his testimony did not seem to have impressed the district judge any stronger than did the latter's. After carefully considering it, we agree with the learned judge in this respect also.

The case is purely one which has to be decided on the credibility of the various witnesses, and the weight which is to be given to their testimony. It is utterly impossible to reconcile the evidence of both sides on any one material point. The trial judge rejected the plaintiffs' version of the accident, and properly so, in our opinion. As he states in his written reasons for judgment, the fact that Mrs. Lakios did suffer a miscarriage several hours after her return to De Quincy gives strong support to her and her husband's theory as to its cause. Nevertheless, there is medical testimony to the effect that Mrs. Lakios, some months after the miscarriage, was suffering from certain diseases, which, the evidence further shows, could have existed prior thereto and might have been the cause thereof. In this respect the case is different from that of Joiner v. Texas & Pacific Railway Co., 128 La. 1050, 55 So. 670, where there was no dispute about the plaintiff having been on a train that was involved in a wreck and that she had been thrown against the corner of a chair in front of her with a force sufficient to bruise her jaw, and there was no evidence of any disease or other cause that might have accounted for her miscarriage.

It is our conclusion that the issue in this case has been correctly disposed of by the judgment of the lower court, which is hereby affirmed.