In this suit plaintiff seeks an award of workmen's compensation on the theory that while performing the duties imposed by a contract of hiring with the defendant, Brown Paper Mill Company, Inc., he suffered an accident within the meaning of the Employers' Liability Law from which resulted permanent total disability. He alleges that it was his duty to oil certain machinery in a wood room and to lift from the floor and place upon a chute or carrier heavy pieces of timber or wood which had fallen therefrom; that on or about August 25, 1939, while on duty and in the act of lifting a heavy piece of said timber or wood the physical strain and exertion needful to do so caused a collapse of his left lung and did seriously and permanently impair both lungs and the nerves, tissues and muscles of his chest, producing the character and degree of disability aforesaid. He additionally alleges that prior to said accident he had worked for two years in the room wherein it occurred and that during this period chemical solutions necessary for treating and manufacturing wood into paper were prepared and mixed by defendant in close proximity thereto; that the fumes emanating from said solutions were charged with poisonous elements and were constantly inhaled by him; that because of the long and regular inhalation of said fumes, his lungs were impaired and their ability to resist disease materially reduced to which condition, plus the strain, the collapse of the left lung is accredited.
Plaintiff further alleges that he notified defendant of the occurrence of the accident and immediately thereafter consulted Dr. J.Q. Graves, defendant's regularly employed physician, requested examination and treatment and was by him treated intermittently for several months; that from time to time said physician would instruct him to return to work with defendant and he did so as often as instructed; that said physician would also from time to time have him to cease work and rest; that finally, on July 25, 1940, after resting for several weeks, he again advised petitioner to return to work, but upon reporting to his foreman and expressing a desire to resume work, he was informed that his services were no longer needed. He was fired. Plaintiff thereafter engaged counsel and this suit followed.
There were some preliminary motions filed and acted upon. They are not urged here and, presumably, have been abandoned. They will be so treated.
Defendant denies categorically each and every allegation of the petition save and except that wherein it is stated that no compensation payments have been made to plaintiff. Further answering, defendant says:
"* * * Respondent avers that plaintiff was paid by it under a group sick and health insurance policy carried by the *Page 334 
Travellers Insurance Company, the sum of Ten and no/100 ($10.00) Dollars a week for thirteen (13) weeks from on or about August 22, 1939, for illness due to disease and likewise for illness due to disease for six and one-half weeks beginning on or about January 17, 1940, and likewise for disability due to illness for a period of five weeks beginning on or about June 16, 1940. Respondent avers that plaintiff is well and able to do work of any reasonable character and is suffering no disability whatsoever from accidental injury occurring during the course of his employment and arising out of the same."
Plaintiff's demand was rejected and he appealed from judgment so decreeing.
A record in volume considerably in excess of the average in cases of this character was built up below, over ninety per cent of which consists of the note of evidence. The testimony largely consists of that given by medical experts, a goodly portion of which is repetitious. The customary degree of hopeless contradictions and irreconcilable differences in opinions (by sides) and interpretations of X-ray pictures by the experts are present. The issues, however, have been narrowed to these: Was there an accident of the character alleged upon and, if so, is the virtually conceded disability to do work of any reasonable character attributable thereto?
Plaintiff, as a witness, frankly admitted that when the alleged accident occurred he was performing his normal, daily duties, a part of which was to lift pulp wood timbers from the floor to the carrier; and it is not contended that the strain on this particular morning was any greater than was customary. This being true, plaintiff argues that the facts of the case bring it squarely within the jurisprudence established by the following cases, viz: Jackson v. Travelers' Insurance Company et al.,180 La. 43, 156 So. 169; Renfrow v. Caddo Parish Police Jury et al., La.App., 155 So. 291; Biggs v. Libbey-Owens-Ford Glass Company, Inc., et al., La.App., 170 So. 273.
The Renfrow case was largely predicated upon the Jackson case, and the Biggs case was in the main based upon the other two. This court, in the Renfrow case, as appears in the syllabus, held:
"Where employee was afflicted with high blood pressure which was aggravated by heavy work required by his employment, injury resulting, while in discharge of duties, from blood vessels of eye bursting and causing loss of sight held compensable as `arising out of employment,' regardless of whether injury was result of an unusual strain (Act No. 20 of 1914, as amended)."
No serious effort was made to prove the allegations that the inhalation of poisonous fumes, etc., impaired the vitality and reduced the power of resistance of plaintiff's lungs. We are warranted in assuming, as we do, that this phase of the complaint has been abandoned.
Plaintiff did not allege that his lungs were affected with tuberculosis when the accident occurred but offered testimony to that effect. Objection to its admissibility under the pleadings was made by defendant. The testimony was admitted subject to the objection. We do not know whether or not the court considered the testimony in arriving at judgment. The objection is not urged here.
Plaintiff's present theory of the cause of disability is that his lungs were at time of the accident affected with latent tuberculosis and because of their weakened condition therefrom, the strain in lifting the piece of wood caused the pneumothorax, and in other respects caused injury to the lungs which activated and aroused preexisting bacillii germs.
Dr. Graves performed an appendectomy on plaintiff on June 29, 1939. He resumed work with defendant on August 13th following, his hours being from midnight until eight o'clock A.M. He testified that at about 7:15 o'clock the morning of August 22nd "when I picked the wood up I had a pain in the chest. I didn't know what it was", and when he lifted the stick of timber above his head and threw it into the chute it "seemed like my chest bursted." He further testified that the stick of timber was of green pine, six feet or six and one-half feet long, about eight inches in diameter and weighed between forty and fifty pounds; that he did no further work that morning as it was only forty minutes to his quitting time; that within a minute or two he spat up blood and did so again after reaching home that afternoon; that he promptly went to the woodyard and informed his foreman, Mr. W.W. Jackson, what had happened.
Plaintiff admits that he did not report the alleged accident to anyone in the first aid room maintained by defendant, as required *Page 335 
by its rules and regulations, full knowledge of which he possessed. He did, however, go to Dr. Graves' clinic in the City of Monroe at about nine o'clock that morning, but as the doctor was out, he did not see him. He returned at eleven thirty o'clock and stated to the doctor that he was feeling badly, had fever and was sick. A blood test and urinalysis were made. Both were negative. He was running temperature. Dr. Graves advised him to return soon in order that an X-ray picture could be taken. This was done on the 25th. The picture revealed spontaneous pneumothorax, a partial collapse of the right lung, involving about twenty-five per cent (25%) thereof. Such a condition is caused from escapage of air from the lung into the pleural cavity, either from rupture or puncture. At that time Dr. Graves' tentative diagnosis was that of incipient tuberculosis. He prescribed rest for several weeks, tonic and regulated diet.
Plaintiff complied with the doctor's instructions. He was clear of fever and able to resume work on November 22nd. He worked until July 16th and quit because he was again running temperature. Dr. Graves again examined him. He was then complaining of his chest. The doctor thought probably he had influenza as that disease was then prevalent in and about Monroe. Plaintiff again resumed rest, tonic and regulated diet. His physical condition enabled him to return to work on March 9th. He suffered a recurrence of the same ailments experienced on the two previous occasions and again consulted Dr. Graves on June 16th. At that time he had fever and his chest was paining. The symptoms were such that Dr. Graves thought he might have bronchitis. The same treatment was again prescribed and on July 29th he was pronounced by Dr. Graves able to perform his regular work. He reported for work that day and was informed by his foreman that his services were no longer needed. The following reasons were assigned by the foreman for the dismissal, viz:
"Habitually off sick, due to laying out drunk; will not follow doctor's orders. Have taken him back at least six times."
When plaintiff engaged Dr. Graves to remove his appendix, he acted on his own account. Neither his employer nor its insurer was obligated to pay for such an operation. Naturally, when he became ill the morning of August 22nd, he again sought the advice and services of Dr. Graves whom he regarded as his personal physician. He was sick and needed a doctor.
During the periods plaintiff was resting and being treated, he at no time mentioned nor intimated to anyone a belief that he was entitled to workmen's compensation but did apply for and was paid, under a group health and accident policy, ten ($10.00) dollars per week for all of said time. He assigns as a reason for not demanding compensation the fear that if he did so he would be discharged; that the difference in weekly payments ($2.61) did not justify the risk. In view of defendant's generous attitude in allowing plaintiff to resume work following each of his four rather long absences from duty, during a period of twelve months, we are not impressed with the reason assigned by him for not asking for workmen's compensation. It is not entirely consistent for him to say that he did not claim workmen's compensation for the reason assigned by him and in the same breath assert that he informed his foreman and Dr. Graves of the happening of the accident.
After plaintiff's discharge by defendant, he applied for relief from the local Social Security organization and was advised that he should furnish a certificate of good health before his application could be considered. He thereafter requested such a certificate of Dr. Graves and testified that his request was refused. Dr. Graves denies that he refused the certificate but says he told plaintiff to return for it on a certain day and that he failed to do so. There appears no good reason for Dr. Graves to refuse such a certificate as he had only a short time prior advised defendant that plaintiff was able to resume his usual work. On this subject plaintiff testified as follows:
"Q. You asked him for it? A. Yes, sir; I had to have a health certificate before I could get anything under my social security and Dr. Graves wouldn't give me a health certificate and then I decided that if I couldn't draw social security and wasn't able to work, I had better see what I could do about it and I came to your office.
"Q. You came to the office of your present attorney? A. Yes, sir. *Page 336 
"Q. And then what happened? A. I filed suit against the Brown Paper Mill."
Plaintiff testified that when he told Dr. Graves about the accident, he also informed him that he spat up blood following its happening. Dr. Graves is positive that plaintiff did not give him such information but admits that plaintiff's mother did tell him about the spitting up of blood. She testified that she heard plaintiff tell the doctor about the accident the day the X-ray was made.
Mr. W.W. Jackson, the foreman, as a witness, denied that plaintiff told him anything about the alleged accident.
This suit was filed August 7, 1940. In the early part of September thereafter other X-ray pictures were made of plaintiff's chest, one by Dr. C.H. Mosley and one by Dr. W.L. Smith, who also made the one for Dr. Graves in August, 1939. These pictures disclose complete recovery of the lung from its partially collapsed condition. It is not known, of course, the date recovery was complete. According to medical experts, with small dissent, recovery from such a collapse should occur between two and eight weeks.
Spontaneous pneumothorax may be caused from physical strain, coughing, laughing, riding, etc. It often occurs without any plausible reason therefor; for instance, when a person is quietly lying in bed and when the individual is in good health. It frequently happens when a lung or the lungs are in an advanced state of tuberculosis. Statistics show that two-thirds of the recorded cases have no history of violent exertion at time of occurrence. It is not uncommon for sputum to become discolored from rupture of small blood vessels simultaneous with the occurrence of a pneumothorax.
Dr. Graves lastly examined plaintiff on September 29th. He testified that while his early opinion was that plaintiff likely had incipient tuberculosis, as the case progressed and further study of the symptoms was made, he was persuaded to believe the early diagnosis erroneous and concluded that plaintiff was suffering from undulant fever, the symptoms thereof and those observable in tubercular cases being in many respects identical. Before he finally formed an opinion in this connection, he arranged with Dr. R.H. Frost, Superintendent of the G.B. Cooley Sanatorium, to physically examine plaintiff and to interpret the X-ray pictures made of his chest with the view of determining lung pathology, if any. This institution is owned and operated by the Parish of Ouachita and exclusively treats pulmonary cases. Dr. Frost has for over twelve years specialized in diseases of the chest, particularly tuberculosis. He appeared as a witness in the case in obedience to court summons and reluctantly testified; in fact, did so only when the court ruled that he should. He was very positive that plaintiff at the time of the examination (September 29th) was not suffering from tuberculosis of the lungs and that neither of the X-ray pictures disclosed any lung pathology save the partial collapse of the right lung which, he found, had fully recovered. He testified that the X-ray is the best single method of determining the presence or absence of tuberculosis of clinical significance. The conclusion reached by Dr. Frost as to plaintiff's physical condition convinced Dr. Graves that his diagnosis of undulant fever was correct.
Dr. W.L. Smith has had extensive experience in making and reading X-ray pictures; such experience extending over a period of nearly twenty years. Since 1936 his practice has been limited to X-ray diagnoses and treatments in Monroe, Louisiana. In neither picture made by him did he find any evidence of active tuberculosis. He did find calcified areas in both lungs which strongly indicated healed tubercular infection. Such pathology, he says, may be found in practically all adult persons; that tuberculosis germs, soon or late, attack the lungs of nearly everyone and the degree of progress made depends upon the general physical condition of the individual. If the individual is strong and healthy, the progress of the germ is retarded, finally arrested and infected areas will heal; but if the individual is of low vitality, weak or sickly, the progress of the germs is more rapid and very soon active tuberculosis develops.
Dr. C.H. Mosley examined plaintiff on September 13th and 14th, 1940, and made an X-ray picture of plaintiff's chest. He has had considerable experience in making and reading X-rays. He testified that his picture clearly revealed evidence of active tuberculosis in both lungs. He, in detail, pointed out on the picture that which he says supports his interpretations. He also testified that the picture made by Dr. Smith in August, 1939, showed evidence of tuberculosis in both lungs but not as clearly as his own picture, from which he deduces that the disease is active. *Page 337 
He was disposed to think plaintiff affected by tuberculosis for some time prior to the alleged accident. He was definite in the belief and opinion that the lung was ruptured by the strain, caused the fever and consequent disability. He supported his conclusions by citing objective and subjective symptoms common to cases of this character. He read the picture made by Dr. Smith in September, 1940, and stated that it "is almost a copy of mine."
Dr. Irving J. Wolff, a general practitioner in the City of Monroe, testified in plaintiff's behalf. He admitted that he was not a roentgenologist but had had considerable experience in the use and reading of X-ray pictures in connection with his practice. He has treated several hundred tubercular cases over a period of twenty years. He made physical examinations of plaintiff on September 2d 4th, 5th, 7th, 9th, 10th and 12th, 1940, and examined the X-ray pictures made of his chest and was of the opinion, after doing so, and correlating objective and subjective symptoms, that plaintiff "has an early tuberculosis." He also thought that the symptoms following the alleged accident indicated the arousing and activating of latent lung pathology.
The testimony pertinent to the alleged accident does not, in our opinion, definitely establish that it did happen. The facts, as testified to by plaintiff, if true, are sufficient to establish an accident within the meaning of the Employers' Liability Act as construed and applied in the three cited cases. However, if, for the sake of argument, we admit the truth of plaintiff's testimony in this respect, and we have decided to do so, it then becomes necessary to decide whether his present disability is shown to be traceable thereto; in other words, is there causal connection shown between the two? We are convinced that this has not been proven.
Assuming that the pneumothorax was caused by the strain, a fact not at all certain, the effect of this injury has definitely passed from the case because all the physicians agree that from nature's process the collapse has disappeared; the lung has regained its normal condition. Then, the question looms large: What is the cause of the recurring and intermittent fevers which have caused and continue to cause disability? This condition could easily be produced by different diseases, particularly by tuberculosis and undulant fever. The text writers say that it often happens that highly qualified and experienced physicians mistake the one for the other and this too, after every known test has been resorted to. Certainly, if plaintiff has undulant fever it cannot be said that the accident caused it, and should we concede that he has tuberculosis, to make the case compensable, we would have to assume or conclude causal connection between its existence and the accident, a fact, in our opinion, the record does not at all make certain.
We have great respect for the learning and ability of all the physicians who testified in this case. But, as regards chest pathology, especially pulmonary ailments, it seems to us that, as an expert, the opinion of Dr. Frost should be accorded superior probative weight. Daily he observes tubercular patients, makes X-ray pictures of them and is devoting his entire time and talents to alleviating this sort of human suffering. He has had long and extensive experience and personal contact in the treatment of such cases. He is definite and positive in his belief and opinion that plaintiff is not now suffering from tuberculosis and that none of the X-ray pictures of his chest discloses active tuberculosis.
We fully appreciate the difficulty, in a case of this character, of proving the cause of disability. But when the testimony fails to establish with reasonable certainty the cause of disability to be that alleged upon, but does disclose that the disability could be the result of another disease, a decision of the issue thus tendered must rest upon the fundamental rule of evidence, that plaintiff is required, before being entitled to a recovery, to prove the verity of his contentions by a fair preponderance of the evidence.
Plaintiff in a compensation case, in keeping with the general rule, and as has been repeatedly held by the courts of this state, carries the burden of proof. Conjecture and probability may not serve as the basis of judgment in such a case, notwithstanding the well established and justified policy on the part of the courts in liberally construing the law in favor of the injured workman or his dependents.
We are unable to perceive error in the judgment appealed from and, for the reasons herein assigned, it is affirmed with costs.
DREW and HAMITER, JJ., concur. *Page 338