HERGET, Judge.
Plaintiff, Frank Olano, instituted this action against Rex Milling Company, Incorporated and its manufacturer’s public liability insurer, The Travelers Indemnity Company, to recover damages in the amount of $6,037 for the loss of his horse “War Sprout” whose death was allegedly caused by ingestion of glass negligently mixed with horse feed manufactured, sacked and dispensed by defendant, Rex Milling Company, Incorporated. The case was tried before a jury which brought in a general verdict in favor of Mr. Olano against both Defendants in the sum of $4,237, with legal interest from date of judicial demand until paid. In accordance with the verdict of the jury, judgment was rendered by the Trial Court for said amount and in which judgment the fees of the expert witnesses were fixed and taxed as costs. From this judgment Defendants prosecute this appeal.
The evidence reveals Plaintiff’s horse became sick and he called Dr. J. C. McLaughlin, a Doctor of Veterinary Medicine, to treat the animal. Dr. McLaughlin testified upon his visitation on Saturday the 9 and Sunday the 10 of December, 1961 or on corresponding days one week later the 16 and 17 the horse was “ * * * in extreme pain, evidently abdominal pain, was unable to be still, wanted to roll, * * He stated the horse had a degree or two of fever and his treatment consisted of administering mineral oil, muscle relaxants and antibiotics. He remained with the horse all afternoon and instructed the owner to keep the horse from rolling, if possible, as such action would cause “ * * * strangulation of an intestine, a twist, torsion of the intestines.” Upon leaving that afternoon he instructed Mr. Olano to give the horse a worm treatment if he recovered. The next morning at 8 o’clock he returned, upon being called by Mr. Olano, and remained there until noon. The horse had not responded to the treatment and Dr. McLaughlin was of the opinion upon leaving Sunday the horse would die and his prediction in this respect, unfortunately, became a fact. Following the death of the horse, Mr. Olano contacted the doctor about the advisability of having the feed analyzed for *556 content. On Dr. McLaughlin’s suggestion Plaintiff allegedly took a sample of feed from the same sack from which the horse had been fed to the State Diagnostic Laboratory for the purpose of having its content checked. Dr. Herbert B. Elliott testified he was Director of the Livestock and Sanitation Board of the Louisiana Department of Agriculture and Immigration, and a licensed Doctor of Veterinary Medicine. His testimony revealed that upon testing the sample of feed furnished to him by Plaintiff, it contained glass. He reported this finding to Dr. McLaughlin. After receipt of this information Dr. McLaughlin, about ten days following the death of the horse, performed an autopsy, concerning which he said: “ * * * upon opening the large intestine at the flexure where it makes the turn next to the diaphragm several particles of glass were found in the interior of the intestine, ingested in the intestine.” Upon ascertainment of this fact, Dr. McLaughlin made no further effort to determine in the post-mortem the cause of the death of the horse.
In response to Plaintiff’s allegation that the feed manufactured by defendant Rex Milling Company contained glass, through negligence on the part of said Defendant, Defendant strenuously denied such as a fact. There is a serious question as to whether or not Plaintiff succeeded in proving the glass in the sack of feed manufactured by Defendant resulted from Defendant’s negligence. However, without determining such to be a fact, assuming the glass was in the feed milled by Defendant through its negligence, we come to the resolution of the question of whether or not if such were the case Plaintiff has proved the ingestion of such deleterious substance caused or contributed to the death of the animal.
In support of his contention that such substance did, in fact, cause or contribute to the death of the horse, Plaintiff called as his two expert witnesses Doctors McLaughlin and Elliott. They were the only expert witnesses who testified as to the causation of the death of the animal and, as the question presented is of unusual interest, as reliance must be placed upon the testimony of the experts as to the causation of the death of the animal, rather than give our conclusions as to their testimony we prefer to quote therefrom copiously. In so quoting we include all pertinent testimony of the experts as to the causation of the death of this animal, as follows:
First, Doctor Elliott testifying:
“Q As a veterinarian, will glass kill a horse?
“A Will glass kill a horse?
“Q Yes.
“A That’s been a controversy, I expect, the biggest controversy that I think I’ve ever heard in veterinary college, and practically every young graduate from any college, if you bring up the subject of ground glass (It’s a subject that comes up about two or three times a year), well, one man says, my neighbor poisoned my dog, I think it’s ground glass. Well, every college has tried to reproduce that to my knowledge (I know of two or three), they don’t even get diarrhea, but now a dog and a horse, I wouldn’t even want to compare because I don’t think it has ever been tried on a horse. There might be an anatomical variation in the, that would be altogether different. With a dog it’s almost impossible.
“Q In other words, you know of no tests on a horse?
“A No, none on a horse. There again, we’ve had tests only on a dog, we’ve really had none on a horse.
* * * * * *
“BY MR. COBB:
“Q Let me ask one other question, Dr. Elliott, you said that the best *557 way to tell about whether or not a horse had died from glass would be by confirming it at a postmortem?
“A Yes, sir, that would he the only way really. * * * ” (Emphasis ours.)
From Dr. McLaughlin’s testimony we find:
“Q Would it be your opinion — let me ask you this, after you found the glass in the small intestine of War Sprout at that time, did you continue the autopsy?
“A No, we only found the glass.
“Q Did you stop then?
“A Yes.
“Q And was it your opinion at that time that the glass probably killed the horse?
"A It was my opinion that it might have been a contributing factor. I couldn’t say that it did.
“Q Did you know of any other factor that might have contributed along with the glass?
“A No.” (Emphasis ours.)
Though in response to the last question supra Dr. McLaughlin testified he knew of no other factor that would have contributed along with the glass to the death of the horse, on cross-examination he conceded the horse could have died of an overdose of worm medicine or it was possible the horse died of just plain colic resulting from too much food in the intestine. (Admittedly Mr. Olano gave the horse a dose of worm medicine in an effort to save it.)
Further, we quote from Doctor McLaughlin’s testimony:
“Q * * * Now you were not here when Dr. Elliott testified but if you knew that he testified that there was a lot of controversy in the veterinary profession as to whether or not ground glass could kill a horse, would you agree with that statement, that there’s quite a controversy?
“A There would be a lot of question, yes.
“Q Can you state positively, doctor, either way that glass can or cannot kill a horse?
“A No.
“Q Did you ever tell Mr. Olano the day you all posted this horse, no doubt that it killed the horse, meaning the glass ? Did you ever make a positive statement to him that the glass killed the horse in your opinion?
“A I don’t remember. If I did, I was, must have been in error.
“Q Well, I will ask you now, doctor, when you performed this autopsy did you render any diagnosis as to what killed this horse? I will go back just a minute. Was this what you call a complete autopsy that you performed—
“A No.
“Q —after Christmas? What would the complete autopsy entail?
“A Well, in a complete autopsy, you examine all the organs and analyze the ingesta for poison, if neces.sary, make microscope slides, culture for organisms. It entails—
“Q You would also examine the contents of the stomach?
“A Yes.
* Hs * * * *
“Q Are you in any position to tell this jury today, doctor, what killed that horse? You are the man we are relying on, you are the veterinarian. What killed that horse?
“A Not definitely, no.
*558 “Q With no degree of certainty?
“A No.
******
“Q And I asked you one thing and you said there was no' — well, let me ask you this, I have a copy of a report, To whom it May Concern, written by you and signed by you, and marked Exhibit D as part of plaintiff’s exhibit P-1. Was that written by you?
“A Yes.
“Q And would you read that to the jury, please, sir?
“A ‘To whom it May Concern: The horse posted for Frank P. Olano was in a partially decomposed condition but the rear end of this abdominal cavity was entire and the colon was entire. On opening the colon at the diaphragmatic flexure several small pieces of glass were found in the contents. Several other pieces were found in stomach contents, where the stomach had ruptured.’ And I signed it.
“Q And you wrote that on the 8th of January 1962?
“A Yes.
“Q And it is addressed on your stationery, To Whom it May Concern ?
“A Yes.
“Q Doctor, would I be correct in saying that when you did the autopsy on the horse there was no real sure way of telling the exact cause of death, but when you found that glass in the horse’s guts you thought that probably the glass killed him?
“A I thought it might have contributed.
“Q And at that time you knew of no other contributing cause other than that?
“A No.
‡ * 4*
“BY MR. ELLISON:
“Q Doctor, did you find any evidence of penetration of the intestines by this glass? Did you find any evidence that the glass had penetrated the intestines?
“A It would have been impossible at that date.
“Q So in response to Mr. Cobb’s last question, can you state with any degree of medical certainty within the bounds of your profession that in your opinion glass caused or contributed to the death of the horse War Sprout? Can you say that with any degree of medical certainty ?
“A No.
“REDIRECT EXAMINATION
“BY MR. COBB:
“Q Doctor, even with the last question, am I correct in saying that you thought that glass might have contributed to the death of War Sprout ?
“A Yes.
“Q That’s all, thank you.” (Emphasis ours.)
Having quoted the testimony of these experts at length, we believe it to be a fail-conclusion from same it is only in the realm of conjecture that glass ingested by a horse can cause or can contribute to its death and the only positive proof of such fact with any degree of certainty is, of necessity, predicated upon a post-mortem wherein actual evidence of such fact is obtained.
There is no evidence in the record of positively finding from the autopsy performed the glass ingested by War Sprout caused or contributed to his untimely demise. The evidence tendered by Plaintiff fails to support the finding with any degree of certainty the. death of this animal was *559 caused by (1) ingestion of glass; or (2) the ingestion of glass contributed to its death. At best, the evidence establishes only a mere possibility or conjecture, which is insufficient to conclude as a fact Plaintiff has proven his case by a preponderance of the evidence to a legal certainty.
In Wilson v. Standard Accident Insurance Company, La.App., (1957) 92 So.2d 781, 783 we find:
“The burden of proof is upon plaintiff, and, as has been declared in a long line of decisions, it is not sufficient for a plaintiff to make out a case that is merely probable but the requirement is that he must establish his case by a preponderance of evidence with legal certainty. Spears v. Brown Paper Mill Co., Inc., La.App., 9 So.2d 332; Powell v. American Employers Ins. Co., La.App., 14 So.2d 333; White v. Delta Shipbuilding Co., Inc., La.App., 24 So.2d 497; Pierce v. Delta Tank Mfg. Co., La.App., 39 So.2d 908; Franks v. Department of Highways for Louisiana, La.App., 43 So.2d 491; Driggers v. Coal Operators Casualty Co., La.App., 73 So.2d 602; Higgs v. Monroe, La. App., 77 So.2d 555.
“There is, therefore, an incontrovertible rule well established in the jurisprudence of this State that the plaintiff in an action in tort, as in other cases, bears the burden of proof; he is required to establish his claims to a legal certainty by a reasonable preponderance of the evidence. Mere possibilities and even unsupported probabilities are insufficient to support a judgment. Roberts v. M. S. Carroll Co., Inc., La.App., 68 So.2d 689.”
For these reasons, the judgment of the Trial Court in favor of Plaintiff is reversed and judgment is rendered in favor of defendants, Rex Milling Company, Inc. and The Travelers Indemnity Company, against plaintiff, Frank Olano, rejecting his demands at his costs.
Reversed and rendered.