BLANCHE, Judge.
This is a suit for damages for miscarriage and related pain, suffering and mental anguish allegedly caused by the negligent operation of an automobile by plaintiff’s husband, Curtis Narcisse, in which plaintiff was riding as a passenger. Made defendant is United States Fidelity & Guaranty Company, the liability insurer of Curtis Narcisse. Plaintiff alleged that while her husband was in the process of turning and backing the Narcisse automobile from the street into the driveway of the Narcisse home, her husband negligently caused the right rear wheel of the automobile to fall into a drainage ditch, causing *187 plaintiff to be knocked about within the vehicle. Plaintiff alleged that she was pregnant at the time of the accident and as a result thereof she suffered the loss of the fetus. Defendant answered the suit denying any negligence on the part of Curtis Narcisse arid further denying in any event that such negligence was the proximate cause of any injury sustained by the plaintiff. In the alternative, defendant pleaded contributory negligence on the part of the plaintiff and by amended answer pleaded in the further alternative that the miscarriage or abortion was caused by the refusal of plaintiff to obey the orders of her physician who directed her not to undertake an automobile trip from Houma, Louisiana, to New Iberia, Louisiana. Judgment was rendered, read and signed by the trial court dismissing plaintiff’s suit, no written reasons being handed down by the presiding judge.
A review of the record convinces us that plaintiff has failed to prove by a preponderance of the evidence that the alleged negligence of her husband was the proximate cause of her subsequent abortion and resultant injuries. This finding makes it unnecessary to pass upon the issues of negligence of Curtis Narcisse, plaintiff’s contributory negligence and the contention of defendant that the injuries were caused by plaintiff’s refusal to obey alleged medical instructions proscribing a trip to New Iberia.
In her petition plaintiff alleged that the accident occurred on or about March 13, 1963, while in her testimony plaintiff stated the accident occurred on March 11, 1963. Dr. H. L. Haydel, a physician engaged in the general practice of medicine in Houma, Louisiana, testified he examined plaintiff on February 19, 1963, and made a tentative diagnosis of possible pregnancy. Dr. Haydel testified he next saw plaintiff on March 12, 1963, at Terrebonne General Hospital, and as a result of his examination he detected vaginal bleeding and a threatened abortion. Dr. Haydel admitted plaintiff to the hospital where she remained until March 15, 1963, when she was discharged, the bleeding having subsided. This was the last time plaintiff ever consulted Dr. Haydel. It is significant to note that Dr. Haydel testified that he treated her for'no symptoms other than cramping and bleeding, thus negating any objective evidence of trauma such as contusion. When questioned concerning the role of trauma in causing abortions in the early stages of pregnancy, Dr. Haydel testified that it is rarely in the early stages of pregnancy that trauma will definitely produce an abortion, and because of the anatomy of the female pelvis and the position of the uterus in the pelvic cavity, it would take a direct blow or virtually a direct blow to the uterus itself in the early stages of pregnancy to cause an abortion. Dr. Haydel also stated he doubted seriously if just a strain on the body caused by any stretching thereof in the early stages of pregnancy would cause an abortion.
The following excerpts from Dr. Hay-del’s testimony are relevant:
Q What were the symptoms that you witnessed and based your diagnosis upon, sir?
A The conclusive diagnosis was made by a frog test. * * * and she had vaginal bleeding and cramps. And clinically it looked like she had a threatened abortion. * * *
* * * * * *
Q Can you rule out the possibility that an abortion or a miscarriage is caused by trauma of let’s say an automobile accident?
A That’s rather a hard question to answer, because we have come across this frequently, why do women abort. We see so many women that do abort without any history of trauma whatsoever, and on the other hand, of course, sometimes people will claim they have a trauma, and they will have an abortion. And during the early stages of pregnancy, as you *188 know the uterus is embedded deep into the pelvic cavity, thoroughly protected, and it’s rarely that — in my experience, of course I am speaking from my personal experience, it’s rarely the early stages of pregnancy do we get a trauma that will definitely produce an abortion. Did I answer the question you asked?
Q Yes, sir. The trauma that do [sic] result in miscarriages, would you say that it would be possible for even a slight trauma to cause it?
A I would say no, unless you would get a direct injury to the uterus itself. If you know the anatomy of the female pelvis, and the position of the uterus down into the pelvic cavity, it lodges deeply into the pelvis, you would have to get a direct blow on the uterus itself in the early stages of pregnancy to cause an abortion. Now, when you are speaking of a woman at term receiving a direct blow to the abdomen, a trauma could definitely cause injury there, but in six to eight weeks pregnancy, you would have to get almost a direct blow right onto the uterus itself containing the embryo.
Q What about, let’s say, 12 to 14 weeks ?
A The baby is in the embryonic stage, and that uterus is not very large, and you would almost have to get a blow I’d say, just directly.
Q Doctor, we have been talking mainly about the trauma itself. What about the results of an external force that would cause an extreme stretching condition in the body, if a woman were hit in an automobile, or in any other conveyance, that would cause her body to turn in any particular way or stretch to an extreme possibly, could this result in a miscarriage ?
A I would answer that question no. I doubt seriously if just a strain on the body in the early stages of pregnancy would cause it. As I mentioned before I think she would probably have to receive almost a direct blow on the lower abdomen.
Dr. Thomas Givens, also a general practitioner of medicine in Houma, Louisiana, testified that he first saw and examined plaintiff in his office on March 22, 1963, at which time he detected vaginal bleeding and marked infection of the pelvic area for which he prescribed antibiotics and other medication. Dr. Givens testified he next saw plaintiff at the emergency room of Terrebonne General Hospital on March 23, 1963, at which time physical examination revealed heavier vaginal bleeding. She was admitted to the hospital for treatment where she remained for four days. Dr. Givens stated he felt she was suffering from a monilia infection from which he said plaintiff had been suffering for months. After the bleeding subsided plaintiff was released from the hospital for bed rest, but she was rehospitalized on March 30, 1963, where she remained until April 2, 1963. Dr. Givens last saw plaintiff on April 5, 1963, at which time the bleeding had subsided although the infection was still present. Dr. Givens also testified that his examination revealed no evidence whatsoever of any trauma and his only knowledge of any trauma was the history as related by plaintiff. When asked about any stretching of the body as a possible cause of the abortion, Dr. Givens stated while it may be possible he could not conceive of any stretching mechanism which would have anything to do with an abortion. Dr. Givens stated that the plaintiff was suffering from a general pelvic infection, which was an infection of the uterus, ovaries and vagina. Dr. Givens stated that infection is a very high cause of abortion in that stage of pregnancy while trauma causes very few abortions at that stage. He stated that the abortion could have taken place because of the in *189 fection instead of any trauma, and he said the infection was the greatest cause of the trouble. The following excerpts from the testimony of Dr. Givens are relevant:
Q What were her symptoms during her stay?
A She was experiencing, as I said, vaginal bleeding. She was also having cramps and discomfort, and she was also experiencing a rather marked infection of the pelvic area.
Q In your professional opinion what was the infection due to?
A That was — I didn’t culture the organism. It was probably due to a monil-ia infection, but that had been persisting for sometime. She had this infection for months.
Q In this case, doctor, did you have any evidence whatsoever that would show that these symptoms were derived from a trauma?
A No.
* * * * * *
Q Then if a woman were to be exposed to a force that would cause her to stretch more than normal, could this do it?
A I couldn’t say. I can’t conceive of any stretching mechanism that would have anything to do with abortion.
* * * * ‡ *
A She had a general pelvic infection, which was an infection of the uterus and the ovaries and the vagina.
******
A The most common cause of abortion at that stage is unknown. We know of no reason most of them abort at 2, 2%, 3 months. Infection is a very high cause of abortion in that age.
Q Do I understand you to say then that trauma cause [sic] very few of those ?
A Yes, sir.
******
Q If you were to add the factor of an infection, such as you have been describing, could you make a choice as to the cause, the trauma, infection or a trip?
A Trauma in this case?
Q Right.
A I would say the infection was the greatest cause of that trouble.
Q What do you base this on, are you familiar with the trauma that was involved ?
A My knowledge of it, I have no knowledge. Now, as I recall she told me or someone told me that her husband was backing the car in a ditch, now to me that is no trauma. You would have to be — a person in my opinion would have to have trauma to the pelvic area like a fist, a head or a steering wheel, some localized trauma.
Q What if, let’s say the patient or the client, were thrown into the side of the car, the door of the automobile ?
A Then she ought to have some bruises. She ought to have contusions. She should have muscle aches and pains. She should have something other than just vaginal bleeding in my opinion.
Q When was the first occasion that you had seen her?
A The 22nd of March.
Q If she had sustained such a trauma that would produce bruises say, from the 1st of April [sic] to March 11th *190 or 12th of that month, would these marks still be visible?
A If they were severe they would be.
* * * * * 5fC
A I would say that if either the trauma or the infection were the cause of this abortion, then I would have to lean more towards the infection. But neither one of them could have been very much a causative factor in this, she might have had an abortion just because the fetus wasn’t right.
jfc íj< ‡ %
A She might have just had an unexplained abortion, and these two factors are just coincidences.
Dr. Kenneth E. Gremillion, recognized by the trial court as an expert in the field of obstetrics and gynecology, testified on behalf of defendant concerning the causes of abortion, Dr. Gremillion never having examined plaintiff. He stated that the most common cause of abortion is from abnormalities of the conception. He testified that in early pregnancy that it would take a substantial trauma to render an abortion likely. Answering a hypothetical question describing the manner in which plaintiff was injured, he replied that the probability of a jolting in the automobile having caused the plaintiff’s abortion was very slight. The following excerpts from his testimony are likewise relevant:
Q What degree of force would be necessary to produce an abortion by trauma to a woman who would be two or two-one/half months pregnant, and what part of her body would have to be hit ?
A Well, due to the factors concerning an early pregnancy, as a general statement I think it can be said that there should be quite a bit of substantial injury or trauma to render an abortion very likely.
Q Would this necessitate a direct blow to the abdomen?
A No, sir, not necessarily, though obviously this would be more incriminating.
Q Assuming that a woman of thirty-six years was two to two-one/half months pregnant, and sitting in the front seat of an automobile with one leg folded under her, and her husband backed the automobile into a street gutter, which was approximately 10 to 12 inches deep, but sloping from the street, could such a maneuver of the automobile cause a sufficient jolt to cause the woman to have an abortion when the evidence shows that she received no bruises to any part of her body ?
A If the question is is it possible, yes, it’s possible.
Q What is the probability of it?
A The probability would be, I think, all factors considered, very slight.
* * * * * *
Q And it would take a considerable blow to the stomach or other part of the body to produce an abortion?
A Well, let’s say it would take a considerable amount of trauma, not necessarily a blow, but certainly considering the size of the fetus, its location in a bony confine, and more primarily in a fluid containing sac, it would take a considerable amount of injury to jeopardize or injure a pregnancy in this early stage.
Q And if a woman showed no bruises to any part of her body, would you conclude that that could bring about an abortion, probably or probably not?
A Probably not, depending on the type of injury incurred. I would say this would certainly reduce the probability of the injury being sufficient *191 enough to cause an abortion if the same injury were not sufficient enough to manifest some outside trauma simultaneously.
* * * * * *
Q Now, you say, doctor, that generally the causes of miscarriages and abortions as they term them are idiopathic or more or less unknown?
A No, I would not say unknown. I would say that the most common cause of an early abortion is that of an abnormality of the conception itself, either in its development or in its implantation into the maternal uterus. This actually has been estimated to account for approximately 60 per cent of our abortions in this country by study.
ífí >}í * ifc ‡ s{c
Q Doctor, could the bleeding which has been called to your attention in this case have been caused by other factors than a trauma?
A Yes, it could have.
Q Could you state to the Court other factors that could cause it?
A Well, we are faced with this problem on all abortions, in that after the symptoms begin, we try to discover a cause, and in so doing search the previous few weeks for any obvious causative factor. If there is trauma during that time we consider it as a possibility, but again in most cases we are left with no tell-tale obvious clinical sign as to the cause. Taking a given number of women who show signs of threatening abortion, and who are examined thoroughly, the symptoms usually are spotting or bleeding, some cramping perhaps, and which ones are due to the activity of the previous week, which ones are due to abnormalities of the conception from conception itself, which ones are due to abnormalities of the reproductive tract, these questions remain unanswered in the majority of the cases.
Q Could it be caused by an infection— an internal infection?
A Infection is certainly also a cause of abortion, either early or late, yes.
* * * * * *
A * * * I have seen such cases where patients have the very same type symptoms you describe without any previous trauma. I have seen patients who have incurred more trauma, and sustained no symptoms, come in for an examination, and continue a normal pregnancy. I would have to be guided by what I have read, and what I have read places trauma as a small percentage cause of early, not late, but early abortions.
The only remaining medical testimony was that of Dr. Larry Joseph Hebert, a practitioner of gynecology and obstetrics in New Iberia, Louisiana. Dr. Hebert testified by deposition that he first examined plaintiff at the emergency room of Iberia Parish Hospital on April 9, 1963, at which time Dr. Hebert diagnosed plaintiff as threatening abortion. Dr. Hebert likewise reaffirmed the lack of external signs of any trauma. Plaintiff was hospitalized but on April 12, 1963, aborted. This was diagnosed as a septic abortion, which Dr. Hebert explained was an abortion where the products of conception are infected within less than twenty weeks of pregnancy. Dr. Hebert stated plaintiff aborted what seemed to be a three and one-half month fetus and placenta. Dr. Hebert was of the opinion that the trauma was the most likely cause of the abortion. He testified that the trauma could have caused a blood vessel in the placenta to rupture which would cut off nourishment to the fetus as a result of which the mother would abort. Dr. Hebert explained that an infection within the uterus could cause a miscarriage or an abortion, while, con *192 versely, the fetus could have died and thereafter become infected resulting in abortion. Dr. Hebert confirmed that an infection within the uterus would cause an abortion, although a diffuse pelvic infection or one outside of the uterus would not, in his opinion, produce an abortion. The following excerpts from Dr. Hebert’s testimony are relevant:
Q Doctor, based on the information available to you, your examinations, and your findings, what would you say was the cause of this abortion?
A I would have to say that the cause of this abortion was most likely the trauma she initially went through as far as the accident is concerned.
******
A Trauma is a definite cause of miscarriages. * * * I’d say most likely what happened is this: When she was jolted in the car, a blood vessel popped. Now, this blood vessel would be located in the area of the placenta — one of the blood vessels in the placenta; and that this continued to bleed off and on for the three weeks after. The placenta is attached inside the uterus. And, a part of it can come off; all of it can come off. Now, looking back over the three weeks or four weeks prior * * * the afterbirth * * * continued to bleed; and that, over a period of time, very gradually, probably the placenta gradually came off because of a collection of blood behind the placenta. * * * And, the baby doesn’t have any nourishment. * * * And, because of that, she aborted.
After testifying that Mrs. Narcisse had an infection inside the uterus which he believed was compatible with a traumatic experience and not one of long standing, as testified to by Dr. Givens, relevant testimony on this point is as follows:
Q Now, if you had an infection that would be called a general or diffuse pelvic infection of long-standing duration * * * would this cause a woman to have a miscarriage?
A I’d say no or probably no.
Q Would you explain this, Doctor?
A A diffuse pelvic infection is * * * an infection * * * in the pelvis, the lower portion of the abdomen * * * an infection of the walls, ovaries, tubes, around the uterus, the supports.
******
Q Now, how is this related anatomically to the uterus or the actual center of the pregnancy?
A It’s two different places. In other words, for example, the infection in a diffuse pelvic inflammatory disease is not usually inside the uterus. And, a diffuse pelvic infection is outside the uterine cavity. * * * And, therefore, it would have no effect on the pregnancy inside the uterus, because it is not an infection inside the uterus.
******
Q Now, did you find any evidence of infection outside of the uterus?
A None.
Q And, the infection that you did find within the uterus was of short duration or in the early stages?
A Correct.
On cross-examination relevant testimony of Dr. Hebert is as follows:
Q And, it takes a very very strong blow to affect it in that stage of pregnancy, does it not?
A Usually to cause a miscarriage, I will say this: It usually takes a direct blow. However, a jolting, for example, can separate part of that afterbirth. And, if that occurs, then, whether she actually aborts three weeks later, that still is the *193 initial cause. And, certainly, a jolting, for example, you can separate the afterbirth from the uterus without a direct blow. But usually, it will be a direct blow.
Q Approximately what is the size of a two or two and a half month fetus ?
A Between seven and nine centimeters.
******
A No. The main cause of abortions are abnormal babies. These are abnormal babies. And, they usually spontaneously abort. In other words, a septic abortion is just a further stage where either the whole or part of that baby became infected. But, it’s a latter [sic] stage. It doesn’t— It’s not the main cause for abortions.
Q Actually, from your own examination, you could not say whether a trauma originally caused this or whether it came from germs?
A On physical examination, I cannot— I have to accept what the patient tells me as being an integral part of my evaluation. But, I would not think that she had had an infection inside that uterus for — If any was present at all, for not too long prior— Because, she would have been having usually [sic] high fever. And, they pass a foul-smelling discharge from the uterus, if it’s present there for a while. And, this will occur maybe in a week or a few days.
Q You stated something about a blood vessel popping. From your examination, you could not come to that conclusion ?
A No. In other words, she was bleeding from — That blood was coming from inside the uterus. But, there is no way to tell from where inside that uterus the blood is actually coming from. Usually, it will be coming from the placenta, because it is composed of blood vessels.
When it is to be considered that the plaintiff sustained no objective symptoms of trauma, which most if not all of the testifying physicians indicated would be necessary to corroborate plaintiff’s contention to at least a reasonable probability, and couple this with the fact that the infection which she had could have also caused her abortion, and add to this the uncertainty of the medical testimony as to the cause, we conclude that the evidence taken as a whole fails to preponderate in favor of plaintiff’s contention that her miscarriage or abortion was caused by the alleged accident. It is obvious from the evidence that she received no direct blow to the uterus. It is a fact that she had been suffering from an infection prior to her abortion. Of all the testifying physicians, only Dr. Hebert proffered the opinion that trauma was the cause of the ultimate abortion and even he indicated the infection within the uterus as well as an abnormal pregnancy could constitute the cause thereof. Doctors Haydel, Givens and Gremillion all indicated their opinion that the trauma allegedly experienced by the plaintiff in the accident was probably not the cause of the abortion which occurred one month after the alleged accident.
In Martin v. Westchester Fire Insurance Company, 183 So.2d 769, 773 (La.App.1st Cir. 1966) this Court had occasion to review on appeal a similar factual situation where plaintiff claimed she suffered an abortion as a result of injuries received in an automobile which she was occupying as a passenger. In affirming the judgment of the trial court denying plaintiff recovery for the alleged abortion on the basis that plaintiff failed to prove any causal relationship between the accident and a possible miscarriage, this Court announced the following applicable principles:
The case of Litton v. Parker, La.App., 106 So.2d 776, speaks generally of the *194 burden faced by plaintiff in a Civil case, and says:
The jurisprudence is well settled that one entitled to a recovery must make and establish his claim to a legal certainty and by a fair preponderance of the evidence. Even to make it probable is not sufficient. Johnson v. Kennedy, 235 La. 212, 103 So.2d 93; Iennusa v. Rosato, 207 La. 999, 22 So.2d 467; Dreher v. Guaranty Bond & Finance Co., 184 La. 197, 165 So. 711; Jackson & Anderson v. Beling, 22 La.Ann. 377. Neither may decisions be predicated on more assumptions of facts. Johnson v. Kennedy, supra; Bates v. Monzingo, 221 La. 479, 59 So.2d 693.
The Second Circuit Court of Appeal, in the case of Wilson v. Standard Accident Insurance Company, La.App., 92 So.2d 781, stated:
The burden of proof is upon plaintiff, and, as has been declared in a long line of decisions, it is not sufficient for a plaintiff to make out a case that is merely probable but the requirement is that he must establish his case by a preponderance of evidence with legal certainty. Spears v. Brown Paper Mill Co., Inc., La.App., 9 So.2d 332; Powell v. American Employers Ins. Co., La.App., 14 So.2d 333; White v. Delta Shipbuilding Co., Inc., La.App., 24 So.2d 490 [497]; Pierce v. Delta Tank Mfg. Co., La.App., 39 So.2d 908; Frank v. Department of Highways for Louisiana, La.App., 43 So.2d 491; Driggers v. Coal Operators Casualty Co., La.App., 73 So.2d 602; Higgs v. Monroe, La.App., 77 So.2d 555.
There is, therefore, an incontrovertible rule well established in the jurisprudence of this State that the plaintiff in an action in tort, as in other cases, bears the burden of proof; he is required to establish his claims to a legal certainty by a reasonable preponderance of the evidence. Mere possibilities and even unsupported probabilities are insufficient to support a judgment. Roberts v. M. S. Carroll Co., Inc., La.App., 68 So.2d 689.
See also Lakios v. New Orleans, T. & M. Ry. Co., 147 So. 525 (La.App.1st Cir. 1933), which again denied claim of a wife for damages for a miscarriage allegedly attributable to injuries sustained by plaintiff while a passenger in defendant’s train even though the miscarriage occurred within several hours after plaintiff got off the train but where the medical testimony indicated plaintiff had been suffering from certain diseases which the evidence showed could have existed prior to the miscarriage and might have been the cause thereof.
Plaintiff cites Delatte v. United States Fidelity & Guaranty Co., 116 So.2d 169 (La.App.1st Cir. 1959) in support of his contention that plaintiff has borne the burden of proving causation, but a cursory examination of that decision indicates that the treating physician was of the definite opinion that the accident caused the premature separation of the placenta, which opinion and diagnosis were verified by inspection of the placenta after premature delivery. While plaintiff contends the alleged trauma received by her in the accident caused a separation of the placenta, the evidence including the pathology report does not bear out such contention. In addition, contrary to the instant case, Mrs. Delatte sustained obvious visible, objective trauma consisting of a four-inch laceration of the right flank which extended three inches beneath the skin.
Inasmuch as plaintiff failed to bear the burden of proving that the alleged accident was the proximate cause of her subsequent miscarriage or abortion, the judgment of the trial court dismissing plaintiff’s suit is correct and for this reason will be affirmed, all costs to be paid by plaintiff.
Judgment affirmed